Estate of Rufus N. Ramsay v. The People, etc., for the use of the Commissioners of the Southern Penitentiary.

1. OFFICIAL BONDS—*Admission in Evidence.*—In this State all official bonds are required to be acknowledged by both principal and sureties before some officer authorized to take acknowledgments of instruments under seal, and such acknowledgment is to be taken as *prima facie* evidence that the instrument was signed, sealed and acknowledged in the manner set forth in such acknowledgment, and is to have the same force and effect as evidence in all legal proceedings as that given to acknowledgments to deeds of conveyance of real estate.

2. SAME—*Want of Approval Does Not Invalidate.*—The requirement that official bonds shall be approved by some other official, is for the purpose of protecting the State, and is a matter in no wise concerning the makers of the bond.

3. SAME—*When the Court Will Look to the Law for the Condition of an Official Bond.*—When the condition of an official bond is not as full as the law requires it should be, the court will look to the law to learn what the duties of the official giving it are, concerning the finances of the institution he represents.

4. SAME—*Application of the Rule " Strictissimi" Juris to Sureties on Official Bonds.*—The undertaking of a surety is *strictissimi juris*, but this rule of law is not to be invoked where it is sought to ascertain the true meaning of words or terms only, and not to enlarge their scope.

5. SAME—*Obligors upon Official Bonds Are Insurers of the Safety of the Public Funds.*—The warden of the penitentiary and the sureties upon his official bond are insurers of the safekeeping of the public funds coming into his possession.

6. PRACTICE—*In Suits upon Official Bonds.*—When the plaintiff in a suit upon an official bond has established the fact that the principal in the bond has received any public moneys which he has not turned over to his successor or to the person or persons entitled to it by law, the burden of showing why he has not turned it over, is upon the defendants in the suit—that is, the officer and his sureties.

Debt, upon the official bond of the warden of the Southern Penitentiary. Appeal from the Circuit Court of Clinton County; the Hon. TRUMAN E. AMES, Judge, presiding. Heard in this court at the February term, 1901. Affirmed. Opinion filed September 4, 1901.

Statement.—January 23, 1893, James D. Baker was duly appointed warden of the Southern Illinois Penitentiary, and on the following day gave what is claimed by

appellees, a temporary official bond, in the sum of $50,000, with Thomas E. Ford, Henry Seiter, and Charles J. Reuter, as his sureties, and he immediately took charge of the penitentiary, receiving from his predecessor in office all unexpended moneys belonging to it, remaining in the hands of such predecessor.

The law requiring the warden to give bond is as follows:

" The warden, before entering upon the duties of his office, shall take and subscribe the oath or affirmation prescribed by section twenty-five, article five, of the constitution of this State. And he shall also enter into a bond to the people of the State of Illinois in the penal sum of $50,000, with good and sufficient sureties, to be approved by the governor and by the said commissioners, or a majority of them, conditioned for the faithful performance of the several duties which now are or may hereafter be required of him by law, which said bond and oath or affirmation shall be deposited in the office of secretary of state." Hurd's R. S. 1899, p. 1267.

On the 15th of February, 1893, Baker executed another official bond in the sum of $50,000, with Henry Seiter, Rufus N. Ramsay and Charles J. Reuter, as his sureties; it was duly acknowledged by the makers, and after having been accepted and approved by the commissioners of the penitentiary, it was deposited in the office of the secretary of state at Springfield, as required by law. The condition of the bond is as follows:

" The condition of the above obligation is such, that whereas, the above bounden James D. Baker has been appointed warden of the Southern Illinois penitentiary, now if the said James D. Baker shall faithfully perform his duty as such warden, then this obligation to be void, otherwise to be in full force and effect."

Rufus N. Ramsay died November 11, 1894, and James D. Baker resigned his office as warden November 30th of the same year, and was immediately succeeded by John J. Schneider.

A large amount of money belonging to the State was received by Baker while he held the office of warden, a part of it from the sale of the products of the penitentiary, and a

part from appropriations made by the State for the support of the institution.

At Lebanon there was what was called a bank, which was run under the name of "Henry Seiter & Co.," but of which Henry Seiter, one of the sureties on Baker's bond, was the exclusive owner. In this bank, Baker kept deposited, in his name as warden, a portion of the funds belonging to the penitentiary. About ten days after Baker resigned as warden, Seiter made an assignment for the benefit of his creditors.

Some time before Baker became warden, he had been a partner of Seiter in the banking business.

Before Seiter made an assignment, and while the bank was running, Baker knew that the assignment was about to be made. From the time he resigned his office until Seiter made his assignment, Baker made no effort to withdraw the money from Seiter's bank, or to turn it over to Schneider, his successor in office.

The balance of the money in Seiter's bank, due Baker as warden at the time Seiter made his assignment, was $11,750, and for this sum a claim in favor of appellees, duly verified, was filed on March 20, 1896, against the estate of Rufus N. Ramsay, in the County Court of Clinton County, and at the same time or soon after, a copy of Baker's bond, which Ramsay had signed as surety, duly certified by the secretary of state, was also filed; but on account of the litigation between the sureties on Ramsay's bond as state treasurer and his estate (which was protracted through several years), this case was not tried until that litigation was ended, when by agreement of parties, this case was transferred to the Circuit Court of Clinton County, where a jury was waived and the case was tried by the court, resulting in a judgment for appellee for the total amount of the claim, to be paid in due course of administration as a seventh class claim, and the estate has brought this appeal.

JOHN G. IRWIN and M. P. MURRAY, attorneys for appellant.

VAN HOOREBEKE & LOUDEN, attorneys for appellee.

MR. JUSTICE BIGELOW delivered the opinion of the court.

This case, in substance, is an action on the bond of February 15, 1893, called by the commissioners the principal or permanent bond, against the estate of Rufus N. Ramsay, one of the sureties on the bond.

No written pleadings were filed in either the County or Circuit Court, and as the parties went to trial by agreement in the Circuit Court, without first trying the case in the County Court, and having it regularly taken by appeal from that court to the Circuit Court, and as an action of debt on a penal bond is not required to be formally brought in the County Court in order to establish a claim for damages against an estate for a breach of the condition of the bond, there is no merit in appellant's first assignment of error, which questions the form of the judgment, because it was not entered for the entire penalty of the bond, to be satisfied by the payment of the $11,750 damages found by the court.

Other minor questions are raised in appellant's brief and argument, which only require to be briefly noticed.

It is contended by counsel for appellant that the bond was improperly admitted in evidence without first proving Ramsay's signature to it. By a law approved May 31, 1879, in force July 1, 1879, and which is now section 1 of chapter 103 of Hurd's Revised Statutes of 1899, it is provided that all official bonds shall be acknowledged by both principals and sureties, " before some officer authorized by law to take acknowledgments of instruments under seal," etc.; and after providing a form of acknowledgment to be substantially followed, it further provides, " which acknowledgment shall be deemed and taken as *prima facie* evidence that the instrument was signed, sealed and acknowledged in the manner therein set forth, and such acknowledgments shall have the same force and effect, as evidence in all legal proceedings, as that given to acknowledgments of deeds of conveyance of real estate."

A deed of real estate acknowledged in the manner the

bond in this case was, would be admitted in evidence by any court in the State without further proof.

We are of the opinion that the bond was properly proven to have been executed by Rufus N. Ramsay, to the extent of putting the burden of proof upon appellant to establish the contrary.

A further contention is, that the bond was not approved by the commissioners of the penitentiary, nor by the governor, as provided by law. As to the commissioners, their approval is indorsed on the bond.

It is true the bond does not appear to have been approved by the governor, but that fact does not render it of no effect. The requirement that such official bonds shall be approved by the governor, is for the purpose of protecting the State, and is a matter that in no wise concerns the makers of the bonds. Mechem on Public Officers, Secs. 311, 312, 313.

It is urged that "it was not within the authority of the commissioners to release the Ford bond."

Whether the commissioners did right or wrong in surrendering or in destroying it (if it was surrendered or destroyed), is a matter we can not inquire into in this case. The question is, did Baker hold the office under the bond in suit in this case, and did he perform the duties required of him by law, and the conditions of the bond? If he did so hold the office, and did not perform the duties, his sureties are liable for his default. But it is urged that Ramsay died before the bond was indorsed "filed," in the office of the secretary of state, and therefore it was not delivered in the lifetime of Ramsay, and so his estate is not liable. This conclusion does not follow from the premises.

We are of the opinion that when the bond was accepted by the commissioners, and was approved by them, that the delivery of it was complete, so far as Baker and his sureties were concerned. Section 8, of chapter 108, of Hurd's R. S. of 1899, requires the bond and oath of office to be "deposited" in the office of the secretary of state, and the uncontradicted evidence is, that immediately after the bond was executed, it was sent to the secretary of state.

The plaintiff below asked, and the court held, four propositions of law, to each of which holdings the defendant excepted.

The defendant below asked the court to hold six propositions of law, all of which were refused, and the defendant excepted to each refusal.

After what we have already said, we think it unnecessary to refer to but one of the plaintiff's propositions and one of defendant's.

Plaintiff's first proposition is as follows:

" 1. Under the law in this case, the warden and his sureties are liable for all moneys coming into his hands as warden of the Southern Illinois Penitentiary by virtue of his office while such warden, and not paid out or disbursed by him as such warden, and the plaintiff is entitled to judgment on the bond for the balance shown by the evidence to have been in his hands at the time he turned the office over to his successor in office."

The condition of the bond is not as full as the law requires it should be, but if it was, it would furnish, by itself, nothing to show what the undertaking of the warden was concerning the finances of the penitentiary, and hence we must look to the law to learn what the warden's financial duties were. Section 19 of chapter 108 of the statute before referred to, provides:

" The warden shall attend to the fiscal concerns of the penitentiary, under the direction of said commissioners, and shall use his best endeavors to defray all the expenses of the penitentiary by the labor of the convicts; he shall superintend the labor of the convicts when employed in manufacturing or other work on behalf of the State and shall act under the direction of said commissioners in making contracts for the employment of the labor of the convicts and for furnishing the necessary supplies for their support, and in purchasing such raw material as may be required for manufacture by convict labor, and in taking charge of the articles so manufactured, and selling and disposing of the same for the benefit of the State."

Section 20 of the statute provides:

" He shall render to said commissioners on the first day of

each month a full and accurate statement of all moneys received by him, and all sums of money expended by him during the preceding month; showing on what account received and expended, and shall accompany said report with proper vouchers for all such expenditures; which report shall be verified by the oath of the warden."

These sections embrace all of the law in regard to the finances of the penitentiary, so far as the warden has anything to do with them.

From the sections of the law above quoted, it will be seen that the warden has substantial charge of all the fiscal affairs of the penitentiary. True, he is under the direction and control of the commissioners whenever they see fit to direct and control him, but in all financial matters where they do not specially direct and control him, he must be answerable directly to the commissioners, and this is doubtless the reason why he is required to give so large a bond.

So far as the money deposited in Seiter's bank is concerned, Baker acted upon his own responsibility, without advice or direction from the commissioners in placing and keeping it there. It appears from the evidence that he alone was in control of the money and he only could check against it. He had a duty to perform in regard to all the money that came into his hands and if he had expended it for his own private use, there could be no question that he had failed to perform his duty, and hence he would have been liable on his bond for the money, and if he was liable, his sureties were also liable. It was his duty to have paid over the money to his successor in office on the termination of his own legal right to retain it. What else could he legally do with it?

Had it been expressly provided in the condition of the bond, that if Baker should pay over to his successor in office all moneys in his hands belonging to the State or penitentiary, the bond should be void, all would agree that if he failed to pay over the money, without legal excuse, the bondsmen would be liable.

If Baker was legally bound to pay over the money, it was one of the duties, for the breach of which his bondsmen

became liable, even though the duty was not expressly named in the bond.

Whatever the warden was by law required to do, became his duty to do.

We are not unmindful that the undertaking of a surety is *strictissimi juris*, but this rule of law may not be invoked where it is sought to ascertain the true meaning of words or terms only, and not to enlarge their scope. If it was not the duty of the warden to pay over the money to his successor in office, or to the commissioners of the penitentiary, then no duty rested upon him under the law, to account for it, in any way that we can discover, and the bond was useless, at least so far as the money was concerned.

We are of the opinion that the words of the bond, " if the said James D. Baker shall faithfully perform his duties as such warden," cover and embrace the duty to account for and pay over all moneys received by him belonging to the penitentiary and not paid out on its account, during his term of office.

Defendant's refused proposition of law, to which we refer, is as follows:

" The court is asked to hold that the makers of the bond sued on did not, by virtue of the condition thereof, become insurers of the funds which went into the hands of the principal of said bonds as warden of the Southern Illinois penitentiary."

The term " insurers" is broad, and may in a given case be construed to cover a loss from an act of God or the public enemy; but it was not used in that sense in the proposition; the sense in which it was used, included all risks and losses not caused in that manner; stated differently, it was intended to hold that Baker was a bailee of the moneys that passed through his hands, and could only be held liable, if at all, in that character. We are aware that on this question there is some conflict in the authorities. In considering the matter the fact must not be lost sight of, that it was money really belonging to the State, that Baker was intrusted with, and it does not matter whether it was re-

ceived from the State treasury or from the sale of articles produced by the penitentiary, or from both sources; it must be classed as State revenue, and when it came to Baker's hands, he was bound to keep it safely, that it might be had at any moment, to meet the needs of the penitentiary. He took the office voluntarily, with all the responsibilities attending it, and if, by reposing confidence in another, a portion of the money with which he was intrusted was lost, he and his bondsmen must answer for the loss. For what purpose was the bond made and the penalty fixed at so large a sum, if not for the purpose of keeping the fund secure from any loss, except through the act of God or the public enemy?

Of what avail is it to require township collectors, county collectors and State treasurers to give heavy bonds to secure the revenue that comes to their hands, if, when it gets to the warden of the penitentiary, the guards that have theretofore secured the safety of the money are not succeeded in turn by another, that holds it secure in the warden's hands, until properly expended or accounted for? If the rule contended for by counsel for appellants is sound as to the warden, we can discover no reason why it should not apply to the other officers before named, as well as to all officers of the customs. In the case of Muzzy v. Shattuck, 1 Denio (N. Y.), 233, the court says:

"The main question which the defendants make in this case is, whether a town collector of taxes is responsible for the payment of the taxes collected by him, to the several public officers to whom he is directed to pay by his warrant, though the moneys thus collected have been stolen from his possession without any fault, want of care, or omission of duty on the part of such collector. The court held the collector and his bondsmen responsible for the taxes."

The condition of the bond in that case, was for the faithful execution of his duties as such collector.

In the case of United States v. Prescott et al., 3 Howard (U. S.), 587, Prescott was a receiver of public moneys at Chicago, and the money for which the suit was brought was

feloniously stolen, without any fault or negligence on his part. The court in delivering its opinion said:

"This is not a case of bailment, and consequently the law of bailments does not apply to it. The liability of the defendant Prescott arises out of his official bond, and principles which are founded upon public policy." * * * "Public policy requires that every depositary of public money should be held to a strict accountability. Not only that he should exercise the highest degree of vigilance, but that 'he should keep safely' the moneys which come to his hands. Any relaxation of this condition would open the door to frauds, which might be practiced with impunity. A depositary would have nothing more to do than to lay his plans and arrange his proofs so as to establish his loss without laches on his part."

The question as to whether the defense set up was a valid one, arose on a demurrer to defendant's plea setting up the manner of the loss, and the demurrer was sustained. The Prescott case was followed in United States v. Morgan et al., 11 Howard, 161, and in United States v. Dashiel, 4 Wallace, 182; also, in Boyden et al. v. United States, 13 Wallace, 17. See also State of Ohio v. Harper et al., 6 O. State, 607, in which the Muzzy case and Prescott case are cited and followed.

Mr. Mechem in his late work on Public Officers, at sections 298–299 and 300, cites other cases in support of the view that an officer, in receiving public money, becomes a debtor and is not a mere bailee; and while in section 301 he gives his own private view that the officer is a bailee for hire, he frankly admits there are but few authorities that sustain his view.

The Supreme Court of this State, in Thompson et al. v. Board of Trustees, 30 Ill. 99, cited with approval and followed in the Prescott case, *supra,* and in the late case of Swift v. Trustees of Schools, 189 Ill. 584, it has affirmed the rule laid down in the Thompson case.

We are of the opinion that the court did not err in holding plaintiff's first proposition of law, nor did it err in refusing to hold defendant's first proposition of law asked to be held.

But if the conclusion at which we have arrived—that Baker held the money as a depositary of public funds and therefore was practically an insurer against its loss—is stating the law too broadly when applied to Baker's sureties, there remains the further question as to whether Baker, if living, would be liable for the money as bailee. What the duty of a bailee of property for hire is, is well understood to be, that he is bound to take such care of it while in his possession or control, as a reasonably prudent man would take of his own property, under similar circumstances.

In considering the facts in the case and the rule of law to be applied to them, we must not omit to consider what may be termed negative facts as well as affirmative facts— what was not proven, as well as what was proven—in order to arrive at a just conclusion in regard to the whole matter.

There is a decided lack of evidence in regard to some material matters, upon which, it would seem, light might have been thrown, and this evidence it was incumbent upon appellant to have produced.

When the plaintiff, by its evidence, established the fact that Baker had received money that he had not turned over to his successor or the commissioners, the burden of showing why he had not paid it over, was upon the defendant; and merely to show that he had intrusted the money to a single individual, whom he knew was doing business under an assumed name of "bank," was not enough to relieve him from liability, because it can not be said that a reasonably prudent person would have intrusted nearly $12,000 of his own money with such a person, unless he had positively known or had reliable assurance from a source on which he could safely rely, that the money would be forthcoming at any time when called for.

If Seiter was, in and by himself, so wealthy as to be entitled to take to himself the additional name of "bank," surely some of his neighbors and friends could have been found willing to testify to his financial ability in the neighborhood where he resided, but not one was called for that purpose, and the only evidence on that point in the record

comes from one of the commissioners of the penitentiary, and it is very general and scarcely deserves to be noticed.

Baker had been a partner of Seiter up to a short time prior to his appointment as warden, and he must have known Seiter's financial condition; and if it was good, what became of his wealth in so short a time? Seiter himself, when testifying, was not asked this question, and if he had been, the only answer he could have made, so far as we are able to see, was that he had little or no wealth of his own.

Under such circumstances shall it be said that Baker, in depositing the money of the State in Seiter's so-called bank, acted with the State's money as a reasonably prudent person would have done with his own money? We can not hold that this question can be answered in the affirmative. To do so, would open the door for innumerable frauds to enter.

Some suggestions are made in the argument of counsel for appellant that perhaps should not go unnoticed. One is.

"That by ordering the money from the State treasury when it was not needed the commissioners made the loss possible; and that the increased risk caused by thus accumulating a large and unnecessary fund, is not a risk assumed by the sureties in executing the bond."

The contention is significant in that it in effect assumes that the commissioners were culpable in aiding the warden in getting money from the State treasury in a manner not justified by law, and really for the purpose of assisting Seiter. Whether such was the case, and the commissioners actually knew they were aiding the warden in getting money from the treasury, when it was not needed to run the penitentiary, but was really obtained for the purpose of holding up Seiter's bank, which Baker must have known was in a failing condition, it is unnecessary to determine in this case, as this action is not against the commissioners.

If it should be established that the commissioners were engaged in the scheme carried out by Baker, and that they should be held liable for the loss of the money, as is claimed by counsel for appellant, that would make no difference

Ramsay v. The People.

with the legal liability of Baker and his sureties on his bond, since the money no more belonged to the commissioners as individuals than it did to Baker. Baker resigned the wardenship nine or ten days before Seiter made his assignment and it was Baker's duty to have immediately turned over all funds in his hands, or under his control, to his successor in office, and if this had been done, it is probable the money would have been saved to the State.

It is further insisted that if the commissioners, on the resignation of Baker, had promptly required him to account to them or to Schneider, his successor in office, the loss would have been averted.

That also may be true; but if it is, the fault of the commissioners can not be used to neutralize Baker's fault. He must, as we have already said, have known that Seiter was liable (to put it mildly), soon to fail entirely; and yet he did absolutely nothing toward securing the money.

Would a reasonably prudent man have done with his own money what Baker did with the money of the State intrusted to him? We are of the opinion he would not.

We are not unmindful of the other points urged in the able argument of counsel for appellant why the judgment should be reversed; but when all are considered, with the facts in the case and the inferences that may be fairly drawn from them, we are unable to come to any other conclusion than that Baker was grossly negligent, if not reckless, in the care of the State's money intrusted to him.

It therefore follows that it does not matter on what theory the case was tried or whether the court erred or not, in holding or refusing to hold propositions of law submitted to it; if the judgment is right, which it is, it should be affirmed, which is accordingly done. Judgment affirmed.